**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TERESA ROUNDS,** | ) | |
| | ) | **No. 11 CV 3410** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN,** Acting | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,**[1] | ) | |
| | ) | **June 18, 2013** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Plaintiff Teresa Rounds suffers from a history of hypertension, coronary artery disease, joint pain, osteoarthritis, and depression. In 2004 she applied for disability benefits but an administrative law judge ("ALJ") denied her claim. In response to a federal complaint seeking judicial review of the ALJ's decision, the district court in that action remanded the matter for further consideration. *Rounds v. Astrue*, 549 F. Supp.2d 1010, 1018 (N.D. Ill. 2008). On remand, and after another hearing, the ALJ again found that Rounds suffered from severe impairments, but that she was not disabled during the relevant time period because she retained the residual functional capacity ("RFC") to perform a range of limited sedentary work and a significant number of jobs existed in the national economy that she could have performed. Rounds seeks to overturn that decision here. For the following

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of the Social Security Administration on February 14, 2013—is automatically substituted as the named defendant.

reasons, the Commissioner's motion for summary judgment is granted and Rounds's motion is denied.

## Procedural History

In June 2004 Rounds filed an application for Disability Insurance Benefits ("DIB") alleging that she became unable to work on March 1, 2000, due to joint pain, mental illness, and coronary artery disease. (Administrative Record ("A.R.") 61.) Rounds later amended her onset date to May 10, 2003. (Id. at 505.) Because Rounds's last date of insured status is June 30, 2004, (id. at 495, 505), Rounds had to establish that she was disabled on or before that date in order to be entitled to DIB.

The Commissioner denied Rounds's application and her subsequent request for reconsideration. *Rounds*, 549 F. Supp.2d at 1012. She then requested a hearing, which took place on August 3, 2006. *Id.* After the hearing the ALJ ruled that Rounds was not disabled. *Id.* at 1014. Rounds filed a federal complaint and sought judicial review of the Commissioner's final decision. *Id.* at 1012. The district court granted Rounds's motion for summary judgment and remanded the matter to the Commissioner for further proceedings. *Id.* at 1018.

On remand, the ALJ held another hearing, (A.R. 567-625), but ultimately denied Rounds's application for benefits, (id. at 505-21). The Appeals Council denied review of the ALJ's decision denying benefits, (id. at 492-94), making the ALJ's decision the final decision of the Commissioner, *see* 20 C.F.R. § 416.1484.

This action followed and after the parties consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c), they filed cross-motions for summary judgment.

## Facts

At the hearing before the ALJ, Rounds presented both documentary and testimonial evidence in support of her claim for benefits.

### A.    Medical Evidence

Rounds has received treatment for cardiovascular problems, joint pain, and depression.   Records from Michael Reese Hospital show that Rounds, who has a history of hypertension and coronary artery disease, underwent a three-vessel coronary artery bypass surgery in April 1995. (A.R. 133.)   She returned to the hospital in 1996 complaining of a strange feeling in her left arm.  (Id. at 140-41.)  In 1997 she returned to the hospital for a total abdominal hysterectomy and bilateral salpingo-oophorectomy (removal of the ovaries and fallopian tubes).  (Id. at 170-223.)  In 2000 Rounds underwent angioplasty and intracoronary stenting.  (Id. at 230.)  Rounds's treatment for hypertension continued with non-remarkable follow-up appointments at the cardiology clinic at Fantus Health Center ("Fantus") in March 2003, August and October 2004, and February through September 2005.  (Id. at 238, 359, 365, 367, 373, 377, 379, 381, 382.)  Rounds visited a cardiologist at the University of Chicago Hospital in May 2006 after what she described as a six to eight month break in cardiology treatment.  (Id. at 392.)  The cardiologist opined that she had "symptomatically stable coronary artery disease" with blood pressure under adequate control.  (Id. at 393.)

Regarding Rounds's mental health treatment, her earliest treatment note is dated October 2003, but an evaluation in her file suggests that she may have begun treatment in 1998. (Id. at 233, 251.) That evaluation was prepared by a psychiatrist with an illegible name, who noted in a July 2004 evaluation that he or she began treating Rounds in 1998 on a monthly basis for complaints of depression and insomnia. (Id. at 233.) The psychiatrist opined that Rounds was moderately limited in her activities of daily living and markedly limited in social functioning and concentration, persistence, and pace. (Id. at 234.) Apart from that evaluation, the earliest treatment note on record dates from October 2003, and it was written by a care provider at the Community Mental Health Council. (Id. at 251.) The provider, whose name is illegible, quoted Rounds's comments that she had experienced "80% relief from depressive s/s" and felt "like my old self" after starting Prozac and low dose Wellbutrin, though she continued to struggle to sleep through the night. (Id.) The care provider noted Rounds's "alcoholic tendencies" and her intention to eliminate alcohol use, and opined that her appearance, affect, speech, thought process, thought content, attention, and memory were within normal limits. (Id. at 251-52.) The care provider also opined that Rounds was suffering from "depression with good symptom relief thus far, grief issues, etoh [alcohol] behavior in past - now decreasing." (Id. at 252.) The report indicates that Rounds's GAF score was 70-75.[2] (Id.)

---

[2] The GAF Scale ranges from zero to 100, and is a measure of an individual's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and*

At a January 2004 follow-up visit for depression and alcohol dependence, Rounds reported to a third care provider with an illegible name that her mood could be better, that her problems sleeping persisted, and that she had decreased energy, but that her concentration had improved. (Id. at 250.) The care provider opined that Rounds's affect, speech, thought content, and attention were within normal limits, and that her thought process was circumstantial (a disturbance in the thought process by details that are tangential and irrelevant). (Id.) Rounds visited with another care provider, likely Dr. Traci Powell, on May 6, 2004. (Id. at 249.) The record from that appointment is incomplete and unsigned. (Id.) The care provider noted that "things are better," with improved sleep and appetite, though Rounds also reported difficulty caring for her daily needs and struggling with memory and concentration. (Id.)

Rounds returned on June 29, 2004, for a visit with Dr. Powell, who commented that Rounds "states she is better than the last time we met." (Id. at 248.) Rounds continued to have family stressors and had not been taking Ambien on a regular basis so that she could help care for her grandson at night. (Id.) She described her mood as good and mentioned that occupational therapy had eased many problems. (Id.) Dr. Powell opined that Rounds's affect, speech, thought process and thought content were within normal limits, and that Rounds's

---

*Statistical Manual of Mental Disorders* 34 (4th ed, Text Rev. 2000) ("DSM-IV-TR"). A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.*

judgment was fair and that her insight was good. (Id.) Dr. Powell wrote that Rounds "continues to have family stressors but reports improvement in depressive symptoms." (Id.) Dr. Powell indicated a GAF score of 55-60.[3]

On July 30, 2004, Dr. Powell completed a medical evaluation form. (Id. at 235-36.) Dr. Powell wrote that she had met with Rounds every four to six weeks for about seven months. (Id. at 235.) Dr. Powell noted that Rounds's complaints of poor sleep, poor concentration and memory, feelings of helplessness and hopelessness, depressed mood and low energy dated from 1990. (Id.) Dr. Powell observed that Rounds had good hygiene and grooming, was in a "good" mood, and had "shown improvement," but she opined that Rounds had extreme limitations in activities of daily living and concentration, persistence, and pace and marked limitations in social functioning. (Id. at 236.)

Rounds returned to Dr. Powell on August 10, 2004. (Id. at 247.) Rounds told Dr. Powell that "she is feeling fine," and "has had some days where she felt in a slump but this did not last long." (Id.) She complained of experiencing intermittent pain, which exacerbated her depression. (Id.) She was not taking Ambien and was waking after four or five hours of sleeping, but was able to return to sleep for three or four more hours at a time. (Id.) Dr. Powell noted that Rounds's affect, speech, thought process and content were within normal limits, her judgment fair, and her insight good. (Id.) Dr. Powell indicated a GAF score of 55-60. (Id.)

---

[3] A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

Rounds visited Dr. Powell again on October 5, 2004. (Id. at 246.) She had not resumed Ambien and was sleeping about five hours per night. (Id.) Rounds admitted to continued alcohol use. (Id.) Dr. Powell noted that Rounds's affect, speech, and thought content were within normal limits, her thought process reflected loosening of associations, her judgment fair, and her insight good. (Id.) Dr. Powell noted that Rounds continued to "have some depressive symptoms in the context of medication semicompliance and ongoing ETOH use." (Id.) Her GAF score remained at 55-60. (Id.) When Rounds returned in November 2004, she told Dr. Powell that her "sleep is okay," averaging seven to eight hours a night with one nighttime waking. (Id. at 328.) Dr. Powell wrote that Rounds continued "to have periodic depression which she states doesn't last." (Id.) Dr. Powell again opined that Rounds's affect, speech, and thought content were within normal limits, her thought content was loosening of associations, her judgment was fair, and her insight was good. (Id.)

In November 2004, Barry Hurwitz, Ph.D., a non-examining psychologist who reviewed Rounds's mental health records for the purpose of providing an evaluation for the state disability agency, opined that Rounds "suffers a mental impairment (Mood Disorder, NOS, Alcohol Abuse) that is not severe." (Id. at 254.) Dr. Hurwitz noted that Dr. Powell's treatment notes describe a person who is "essential[ly] WNL," meaning "within normal limits," which did not support Dr. Powell's assessment of Rounds's extreme and marked limitations. (Id.) In Dr. Hurwitz's opinion, Rounds did not have any restrictions in activities of daily living or

difficulties in maintaining social functioning, though she showed mild difficulties in maintaining concentration, persistence, or pace. (Id. at 258-270.) Dr. Hurwitz found no evidence of episodes of decompensation. (Id. at 268.)

Rounds continued to see Dr. Powell on a monthly basis, with some breaks, in 2005 and into 2006. (Id. at 317-27.) Rounds's GAF score remained a constant 55-60 from January 2005 through May 2006, when Dr. Powell wrote the final treatment note. (Id.) Dr. Powell completed a second mental impairment questionnaire in February 2005. (Id. at 282-89.) Dr. Powell noted that Rounds "has numerous medical conditions which exacerbate her depression and vice versa." (Id. at 284.) She opined that Rounds is moderately limited in her activities of daily living and social functioning, suffers frequent deficiencies of concentration, persistence, or pace, and has had three or more episodes of deterioration in work or work-like settings. (Id. at 288.)

When Dr. Powell completed a third mental impairment questionnaire in July 2006, she indicated that the symptoms and limitations described in the questionnaire were present as of June 30, 2004. (Id. at 337-41.) Dr. Powell opined that Rounds's current GAF scores were 50-55 and commented that her "chronic pain . . . exacerbates her depression." (Id. at 337-38.) According to Dr. Powell, Rounds maintained fair hygiene and grooming, was cooperative, and exhibited good eye contact. (Id. at 338.) Dr. Powell noted the following symptoms associated with her diagnosis of major depressive disorder: poor memory, appetite disturbance with weight change, sleep and mood disturbance, pervasive loss of interests, psychomotor

agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, and somatization unexplained by organic disturbance. (Id.) She opined that Rounds's impairments would cause her to be absent from work more than three times a month. (Id. at 340.) In describing Rounds's limitations, Dr. Powell opined that Rounds had poor or no ability to remember work-like procedures, but that she can understand and carry out simple instructions, maintain attention for two-hour segments, work in coordination or proximity to others without distraction, complete a workday or work week without interruptions from her symptoms, and work at a consistent pace. (Id. at 340-41.) She also opined that Rounds was seriously limited but not precluded in her abilities to maintain regular attendance and punctuality, to sustain an ordinary routine without supervision, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions or respond appropriately to criticism, to get along with peers without unduly distracting them or exhibiting behavioral extremes, to respond appropriately to changes in a routine work setting, and to deal with normal work stress. (Id.) In Dr. Powell's view, Rounds was moderately limited in activities of daily living and social functioning, with constant deficiencies in concentration, persistence, or pace, and had suffered three or more episodes of decompensation. (Id. at 343.)

Treatment records show that Rounds saw a therapist, Erica Eugene, from January through May 2006 on a nearly weekly basis. (Id. at 309-16.) Eugene's

records describe Rounds as complaining of low energy, sadness, frustration, crying spells, and poor concentration, and also show that Rounds had some better days: Eugene noted that Rounds reported "feeling better" and feeling "okay." (Id.)

Regarding Rounds's osteoarthritis, the medical record reflects a May 2004 referral form for physical therapy and records of physical therapy from May and July 2004 and February through November 2005. (Id. at 290-94, 356, 357, 361-62, 364, 369, 371, 376.) On a July 2004 physical therapy patient questionnaire, Rounds reported that she was having difficulty with housework, grooming, bathing, walking, ascending stairs, lifting, and sleeping. (Id. at 291.) She characterized her pain as "constant" and explained that it was aggravated by bending, sitting, rising, standing, walking, and being on the move. (Id.) She stated that she was seeking therapy to address osteoarthritis in all joints, including her right knee and hip and left shoulder. (Id.) Dr. Niv, an orthopedic consultant with the state disability office, opined in November 2004 that because the medical record "does not include any objective musculoskeletal findings," there was "insufficient documentation to assess the claimant's allegations" of disability. (Id. at 256.)

Rounds received further treatment for osteoarthritis in conjunction with a June 2006 visit to the emergency room for a "pretty severe bout of viral gastroenteritis." (Id. at 390.) Dr. John Yoon examined her and summarized her history of coronary artery disease, osteoarthritis, and depression. (Id. at 390-91.) Dr. Yoon observed that Rounds had "pretty good range of motion" and walked with a cane. (Id. at 391.) Dr. Yoon ordered x-rays after observing crepitus in Rounds's

knees and "some pain upon flexion of her knee with resistance." (Id.) The radiologist who reviewed the x-rays of Rounds's knees and hips opined that the films showed marked osteoarthritis of bilateral hips but normal bilateral knees. (Id. at 388, 413.)

Dr. Yoon completed an RFC questionnaire. (Id. at 346-51.) He wrote that Rounds complained of left elbow and right knee pain since 2000, and more recently, of finger and hand pain. (Id. at 346.) He described Rounds's symptoms as right knee pain and stiffness, difficulty ascending stairs, and increased pain with movement. (Id.) Dr. Yoon observed decreased range of motion in Rounds's right knee and left elbow, crepitus, and an abnormal gait. (Id. at 347.) He commented that her depression affected her pain, but she was capable of a low-stress job. (Id. at 347-48.) Dr. Yoon opined that Rounds could walk three blocks without rest or severe pain, could sit for more than two hours at one time, could stand for ten minutes, and during an eight-hour period, could sit and stand less than two hours. (Id. at 348-49.) He also opined that Rounds would need to walk around every 30 minutes, for about 10 minutes at a time, during an eight-hour workday, and would need a job that allowed her to shift at will from sitting, standing, or walking and allowed her to take five to six unscheduled breaks a day for 30 minutes at a time. (Id. at 349.) Dr. Yoon confirmed that Rounds's impairments were likely to produce "good days" and "bad days," and would cause her to miss work about twice a month. (Id. at 351.)

**B.     Rounds's Testimony**

At the hearing, the ALJ reminded Rounds that the relevant time period for assessing her eligibility for benefits was May 1, 2003, through June 30, 2004. (A.R. 579.)  At that time, Rounds weighed "a little over 200" pounds and was 5'6" tall.  (Id. at 605.)  Rounds testified that in May 2003, she was unemployed and living with her daughter and her grandson, who was then three years old.  (Id. at 589-91.)  She did not take care of her grandson on her own because he was too rambunctious.  (Id. at 594.)  Rounds testified that she was "always tired" and not interested in grooming, and washed her face and brushed her teeth only when she had somewhere to go.  (Id. at 591.)  She kept the curtains drawn in her room and rarely let any sunlight into her room.  (Id. at 592.)  She would leave her room only to go to the bathroom or out for an appointment.  (Id.)  She also ate her meals in her room. (Id.)  Her daughter and grandson would visit her in her room, and she went out to the living room or kitchen only once or twice a week.  (Id. at 592-93.)

Regarding household chores, Rounds testified that she emptied the garbage "now and then."  (Id. at 593.) She kept her room clean, assisted her daughter occasionally with cooking and washing dishes, but would sit while washing them because standing would aggravate her knee and hip.  (Id. at 601.)  She could stand for about 10 minutes, and she could sit for about 15 or 20 minutes before she would need to lie down because of the pain in the right knee and right hip.  (Id. at 604.) She also testified that when she felt pain after sitting, she would stand up, stretch, and walk around the living room for five or six minutes before lying down.  (Id. at

607.)  During the relevant time period, Rounds experienced weak wrists, for which the physical therapist gave her wrist supports.  (Id.)  She was capable of lifting a gallon of milk with her right hand, but not with her left, because her left elbow would give out.  (Id.)

She went to the grocery store about once a month but never alone.  (Id. at 602.)  She walked two blocks to a corner store about once a week to buy drinks and snacks.  (Id.)  Two blocks was the longest distance that Rounds could manage before having to stop. (Id. at 603.)   In 2004, she walked with a one-pronged cane.  (Id.) During the 2003-2004 time period, Rounds had a driver's license but she did not drive.  (Id. at 600-01.)   Her sleep was "awful" until she was prescribed sleep medication.  (Id. at 601.)  She napped maybe two or three days a week, sometimes for only a half hour, but other times for two to four hours.  (Id. at 608.)

She socialized with the next-door neighbor once or twice a week, and other people would telephone her, but she did not make out-going calls.  (Id. at 593.)  She spent her time watching and listening to soap operas or reading, usually while lying on her bed.  (Id. at 594, 602.)  When watching television, she would have trouble concentrating and would fall asleep after 45 minutes.  (Id. at 605-06.)  She was in bed "all the time, all day."  (Id. at 606.)  On a good day, she would spend about five or six hours of the day in bed.  (Id.)

In May 2003, Rounds experienced pain "all the time" in her right knee, right hip, and left elbow.  (Id. at 595.)  On a one to ten scale, with one being the least pain, Rounds rated the right knee pain as a six.  (Id.)  To alleviate the pain, which

13

she felt throughout the day, Rounds tried "to work it out and rub ointment on it" and she took prescription Motrin. (Id.) Rounds rated the right hip pain as an eight, confirmed that she felt the pain "24/7," and stated that she applied alcohol to the hip, tried to stay off of it, and took Motrin to alleviate her pain. Regarding the elbow pain, Rounds stated that it hurt about four days a week, and to alleviate the pain, she would soak it in a bath of hot water, alcohol, and crushed aspirin. (Id. at 596.) When the ALJ questioned Rounds's lack of medical treatment for this severe pain, Rounds explained that she attended physical therapy on a weekly basis. (Id. at 597.) Rounds's attorney confirmed that there were no records of medical visits between September 2003 and October 2004 other than records of physical therapy appointments, though this court found records, described above, of two visits to the cardiology clinic at Fantus during that time period. (Id. at 379, 381, 597-98.) But Rounds claimed that she visited the primary care unit at Fantus "way more" than the medical records show, and she complained that "[s]omebody screwed up" in the records department. (Id. at 599.)

Rounds testified that she attended weekly physical therapy sessions for about two or three months starting in July 2004. (Id. at 600.) A physical therapist suggested that Rounds use a cane, and she found the cane helpful for taking weight off the right hip and knee. (Id. at 612.) The cane was not prescribed by a physician. (Id.) In regards to her mental health treatment, Rounds testified that she saw psychiatrists at Fantus on a monthly basis from 1998 until the time she started with Dr. Powell, but could not recall the names of any of the psychiatrists she saw

14

at the clinic.  (Id. at 585-86.)  She was unable to locate any treatment records.  (Id. at 586-87.)

## C.  Medical Expert's Testimony

Dr. John Cavenagh, a board certified internist and cardiologist, served as a medical expert at the hearing. (A.R. 579, 612-18.)  Dr. Cavenagh testified that he believed that Rounds suffered from osteoarthritis of the hips in 2003 and 2004, but because there was not "any good objective evidence for during that period of time," he could not estimate its severity in 2003 or 2004.  (Id. at 613, 615.)  He testified that the 2006 x-rays of Rounds's hips showed "marked osteoarthritis," but he "could not testify as to the severity of the osteoarthritis two years and three years earlier because osteoarthritis may progress very slowly over many years or it may in some instances progress very rapidly."  (Id. at 613.)  Regarding Rounds's right knee, Dr. Cavenagh did not find any medical evidence to substantiate Rounds's allegations of osteoarthritis during the relevant time period.  (Id. at 614.)  Though he acknowledged that Rounds had complained of right knee pain at an outpatient visit in August 2004, he explained that the record contained no physical findings on that point and x-rays taken two years later showed a normal knee.  (Id. at 615.)  Moreover, in 2006, Rounds's symptoms in the right knee had abated.  (Id.)  Dr. Cavenagh concluded that Rounds would not have needed an assistive device during the relevant time period despite her osteoarthritis of the hips.  (Id.)  He also noted that "[t]here's no evidence of cardiac symptoms that I found in that period of time in the record."  (Id.)

Dr. Cavenagh opined that Rounds did not meet a listing before her insured status expired. (Id. at 617.) He believed that Rounds would have been capable of sedentary work at that time. (Id. at 616-17.) Dr. Cavenagh confirmed that he had considered Rounds's obesity as "an aggravated factor in her arthritis of the hips" in concluding that she would have been capable of sedentary work. (Id. at 617.)

## D.    Vocational Expert's Testimony

Pamela Tucker, a rehabilitation counselor, testified that Rounds's past work would be described as an office clerk, which she performed at a light exertion and semi-skilled level. (A.R. 579, 619.) Her past work as a secretary was classified as semi-skilled and sedentary, but Tucker testified that Rounds performed that position at a medium exertion level. (Id. at 619.) The ALJ asked Tucker to imagine an individual of Rounds's age and education who was capable of modified sedentary work, meaning that she could not crawl and needed to shift every 30 minutes, and could push and pull only on a limited basis. She asked Tucker also to factor in a need for mentally simple work and routine work that required only limited contact with others. (Id.) Tucker opined that this person would not be able to perform any of Rounds's past work, but she would be able to work as an assembler, a bench worker, or a sorter. (Id. at 619-20.) Tucker maintained that all of these positions would be within the hypothetical individual's capacity even with the following additional limitations: no climbing ropes or ladders, only simple tasks, and only limited changes in her work setting. (Id. at 620.)

16

## E.    The ALJ's Decision

In evaluating Rounds's claim, the ALJ applied the five-step sequential inquiry for determining a disability, which required her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [she] can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*See Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).   If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet one of the impairments listed in Appendix 1, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence."   20 C.F.R. § 404.1520(e).   A claimant's RFC is the quantification of what she can still do despite her limitations.   *Id.* at § 404.1545(a)(1).   The ALJ uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work.   *Id.* at § 404.1520(f), (g).   It is the claimant's burden to prove that she has a severe impairment that prevents her from performing past relevant work.   *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); 42 U.S.C. § 423(d)(2)(A).

The ALJ denied Rounds's claim.   (A.R. 505-20.)   At step one, the ALJ found that Rounds had not engaged in substantial gainful activity during the period of May 10, 2003, her onset date, through June 30, 2004.   (A.R. 513.)   At step two, the ALJ found that Rounds had severe impairments—ischemic heart disease,

cardiovascular disease, depression, obesity, and hypertension—and that Rounds's degenerative joint disease of the elbow, back, and knees were "not severe" during the period of consideration. (Id.) At step three, the ALJ found that none of Rounds's severe impairments, alone or in combination, met or equaled an impairment in 20 C.F.R. §§ 404.1520(d), 404.1525, or 404.1526, during the relevant time period. (A.R. 513.) Before reaching step four, the ALJ assessed Rounds's RFC and determined that she retained the ability to lift and/or carry up to 10 pounds occasionally; stand and/or walk at least two hours in an eight hour workday; sit about six hours of an eight hour workday, with the ability to shift every 30 minutes; occasionally balance, stoop, kneel, crouch, and climb ramps or stairs; and perform simple, unskilled work, in a routine environment with limited contact with employees, the public, and supervisors. (Id. at 515.) At step four, the ALJ concluded that Rounds was not capable of her past work as a secretary or office clerk through the last date of her insured status. (Id. at 518.) At step five, the ALJ concluded that Rounds would have been able to work as an assembler, bench worker, or sorter through the relevant time period, and therefore was not disabled. (Id. at 519.)

## Analysis

This court reviews the ALJ's decision with deference and will affirm it if it is supported by "substantial evidence." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971). "To determine if substantial evidence exists, the court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (internal quotation omitted). If reasonable minds could disagree as to whether the claimant is disabled, this court must uphold the decision under review. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Rounds argues that substantial evidence does not support the ALJ's rejection of Dr. Powell's and Dr. Yoon's opinions, the ALJ's adverse credibility ruling, or the ALJ's RFC determination.

## A.     Treating Physicians' Opinions

Rounds faults the ALJ for assigning little weight to Dr. Powell's July 2006 opinion and to Dr. Yoon's opinion. "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)(citing 20 C.F.R. § 404.1527(d)(2)).[4] However, an ALJ "may discount a treating physician's medical opinion if it [sic] the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long

---

[4]  The Commissioner amended this regulation by removing paragraph (c) and re-designating paragraphs (d) though (f) as paragraphs (c) through (e).  77 Fed. Reg. at 10656-57 (2012).

as [she] minimally articulates [her] reasons for crediting or rejecting evidence of disability." *Schmidt*, 496 F.3d at 842 (internal quotations omitted).

The ALJ explained that Dr. Powell's July 2006 opinion did not control because "the opinions expressed . . . are not supported by the claimant's treatment records, including the treatment notes of Dr. Powell as well as the treatment notes of her colleagues at the Community Mental Health Council." (A.R. 517-18.) The ALJ referred to treatment records that showed that Rounds's "depression had improved," the mental status exams "reflected that the claimant had few symptoms," and the findings were "typically within normal limits." (Id. at 517.) The ALJ found these records to be at odds with Dr. Powell's July 2006 opinion that Rounds had moderate limitations in daily living, moderate limitations in social functioning, and frequent limitations in maintaining concentration, persistence, and pace, along with three or more episodes of decompensation. (Id.)

Rounds argues that the ALJ's reading of the medical evidence is wrong—in her view, Dr. Powell's treatment notes support her July 2006 opinion. Rounds cites Dr. Powell's and therapist Eugene's treatment notes from 2005 and 2006 to show that she was exhibiting depressive symptoms, poor energy and motivation, feelings of helplessness and hopelessness, crying spells, sleep disturbance, and dysphoria during that time period. While these records show a deepening of Rounds's depression, this court must agree with the Commissioner that Dr. Powell's and Eugene's treatment notes from 2005 and 2006 are less relevant than treatment notes from 2003 to 2004, the time period that Rounds was insured. *See Martinez v.*

*Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) ("[Claimant] had social security disability coverage only until the end of 2003; if she was not disabled by then, she cannot obtain benefits even if she is disabled now[.]") (citing 42 U.S.C. § 423(c); 20 C.F.R. § 404.140). The treatment notes from that period show that Rounds claimed "80% relief from depressive symptoms," and a GAF score of 70-75. (A.R. 251-52.) Similarly, in January and June 2004, treatment notes mention Rounds's complaints of low energy, but also include her comments that she was enjoying increased concentration and good mood. (Id. at 248, 334.) Those notes, like the ones from May and June 2004, describe a patient who was within normal limits for affect, speech, and thought process, though not consistently for thought content, and who told her psychiatrist that "things are better," "better than the last time we met," and was enjoying better sleep. (Id. at 248, 249, 334.) The ALJ's careful summary of the medical record includes a lengthy discussion of these treatment notes. (Id. at 509-10.) And as the ALJ point out, despite Rounds's reported problems with sleep, memory, and concentration during the relevant time period, Rounds also claimed that she was "better," "feeling fine," and that feelings of being in a slump did not last long. (Id. at 509-10.) This court finds that substantial evidence supports the ALJ's conclusion that Dr. Powell's treatment notes from the relevant time period are inconsistent with her July 2006 opinion that Rounds's mental impairment caused moderate limitations in activities of daily living and social functioning, constant deficiencies of concentration, persistence, and pace, and repeated episodes of decompensation in work or work-like settings.

Rounds's secondary criticism that Dr. Powell's treatment notes show her only on her "good days," and do not reflect the waxing and waning of her depression, is also unpersuasive. She suggests that the treatment notes might have captured her at her best because perhaps she saw her therapist on her good days, but not on her bad days, whereas the July 2006 opinion reflected both the good and bad days. She cites *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008), for the proposition that an ALJ must address the waxing and waning symptoms of mental impairments and may not assume that a claimant's overall condition is consistent with a snapshot of a single moment.

This court finds Rounds's analogy to *Bauer* wanting. In *Bauer*, the claimant's treatment records documented wild vacillation of symptoms, as is typical of bipolar patients. *Bauer*, 532 F.3d at 609. Furthermore, the court in *Bauer* took issue with the ALJ's seizure of only the occasional hopeful remarks in the medical record and glossing over of evidence regarding the hospitalizations and other downturns. *Id.* Accordingly, any argument invoking *Bauer* here is unpersuasive because Dr. Powell's treatment notes from the relevant time period describe Rounds's condition with remarkable consistency. Whereas plaintiff Bauer could point to aspects of the medical record that were grossly at odds with the hopeful comments, Rounds has not focused this court's attention on any aspect of Dr. Powell's treatment notes that show that she observed and treated major vacillations of symptoms during the relevant time period.

Having found that substantial evidence supports the ALJ's conclusion that Dr. Powell's treatment notes from the relevant time period were inconsistent with her July 2006 opinion, and that the opinion is thus not entitled to controlling weight, *see Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002); *see also* 20 C.F.R. § 404.1527(c) (stating that a treating physician's opinion is given controlling weight if it "is not inconsistent with the other substantial evidence" in the record), this court turns to Rounds's argument that the ALJ failed to weigh Dr. Powell's opinion according to the checklist of factors listed in 20 C.F.R. § 404.1527(c). Those factors include the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability and consistency of the opinion, the doctor's specialty, and other factors brought to the ALJ's attention. *Id.*

Here, although the ALJ did not explicitly consider each factor in the paragraph in which she concluded that Dr. Powell's opinion is worthy of only "little weight," the decision mentions many of the 20 C.F.R. § 404.1527(c) factors, such as Dr. Powell's title of "M.D.," her practice at a mental health clinic, her history of meeting with Rounds on 14 occasions between August 2004 and May 2006, and the supportability and consistency of her opinion. (A.R. 517-18.) Regarding the opinion of Dr. Hurwitz, the non-examining state psychologist, the ALJ acknowledged that Dr. Hurwitz is not a medical doctor, and that he did not treat Rounds. (Id. at 518.) Rounds argues that the ALJ was compelled by the regulations to give Dr. Powell's opinion more weight than Dr. Hurwitz's because Dr. Powell is a specialist, but she

obscures the ALJ's primary reason for crediting Dr. Hurwitz's opinion over Dr. Powell's. The ALJ found Dr. Hurwitz's opinion "supported by the . . . evidence in the case record and consistent with the record," whereas she found Dr. Powell's opinion to be contradicted by her own treatment records from the relevant time period. (Id.) Even if this court might have afforded Dr. Powell's opinion more weight, this court must allow the ALJ's "decision to stand so long as the ALJ 'minimally articulated' [her] reasons—a very deferential standard that we have, in fact, deemed 'lax.'" *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008); *Jens*, 347 F.3d at 212 (stating that the reviewing court cannot reweigh evidence). The ALJ met that standard here.

Rounds also challenges the ALJ's assessment of Dr. Yoon's opinion. The ALJ concluded that his opinion is entitled to little weight for the following reasons: he did not render his opinion until two years after Rounds's insured status had expired; Dr. Yoon's opinion was based on a single assessment of Rounds and was without supporting treatment records; some of his comments appear to be based on the history presented by Rounds rather than on his examination; and his opinion was internally inconsistent in that he opined that Rounds could sit less than two hours in an eight-hour workday but could sit for more than two hours continuously. (A.R. 518.) Rounds acknowledges that the ALJ provided these specific reasons for discounting Dr. Yoon's opinion, as is required by 20 C.F.R. § 404.1527(c)(2), but argues that they are not "good" reasons.

24

This court finds that the ALJ's reasons conform to the factors listed in 20 C.F.R. § 404.1527(c)(2), and that they are supported. For example, the ALJ considered whether Dr. Yoon's relationship was an "examining relationship," and concluded that part of his opinion was based on Rounds's subjective complaints and history, as opposed to his observations during an examination. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("[I]f the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it.). The ALJ's conclusion in this regard is not erroneous—though the treatment notes describe the crepitus and good range of motion that Dr. Yoon observed, most of the notes merely summarize Rounds's recitation of her medical history. (A.R. 390-91.) The ALJ's consideration of the brevity of the treatment relationship was also appropriate, as 20 C.F.R. § 404.1527(c)(2) states that the medical sources capable of providing a "longitudinal picture" are entitled to greater weight, and here, Dr. Yoon based his assessment on a single examination. The ALJ's conclusion that Dr. Yoon contradicted himself in opining that Rounds could sit continuously for more than two hours, but could not sit for two hours during an eight-hour day, is also a relevant factor: an ALJ "may discount a treating physician's opinion . . . when [his] opinion is internally inconsistent." *Skarbek*, 390 F.3d 500, 503 (7th Cir. 2004.) As substantial evidence supports the ALJ's evaluation of Dr. Yoon's opinion—which was the product of a single encounter two years *after* Rounds's insured status had expired—this court may not disturb the ALJ's treatment of his opinion.

### B.    Credibility Determination

Rounds argues that the ALJ's credibility determination must be overturned. In her view, the ALJ's "boilerplate language" obfuscated her reasons for rejecting Rounds's testimony.  The ALJ wrote:

> [A]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 516-17.)    As Rounds points out, the Seventh Circuit has criticized this template as "opaque," *Bjornson v.  Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and "meaningless," *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), and has noted that it "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility," *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (internal quotation omitted).  But "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [s]he otherwise points to information that justifies [her] credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). Rather, the inclusion of this meaningless template can amount to harmless error if the ALJ has "otherwise explained [her] conclusion adequately" and has offered "reasons grounded in the evidence" for discounting the claimant's testimony. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Even as Rounds criticizes the ALJ for using meaningless template language, she recognizes that the ALJ provided nine specific reasons for the adverse

credibility finding. In her view, none of the ALJ's reasons are valid or supported by the evidence. Keeping in mind that the ALJ's credibility ruling is entitled to "considerable deference" and can be overturned only if it is "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), this court will examine whether the ALJ's reasons are "unreasonable or unsupported," *see Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). Only if the "ALJ's determination lacks any explanation or support . . . will [this court] declare it to be 'patently wrong.'" *Elder*, 529 F.3d at 413-414.

Rounds challenges the ALJ's rejection of her testimony about the severity and persistence of her joint pain. The ALJ questioned this testimony because "there is little in the way of objective examination findings and no radiological evidence" to substantiate her claim, and the available radiological evidence—the x-rays from two years after Rounds's insured status expired—undercut her testimony. (A.R. 516.) Rounds argues that the ALJ's analysis here is flawed because it relies too much on objective evidence in violation of 20 C.F.R. § 404.1529(a). That regulation requires an ALJ to consider many factors, including statements made by the claimant or treating or non-treating doctors, the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence in addition to objective medical evidence when evaluating a claimant's testimony about her symptoms and pain. *See* 20 C.F.R. § 404.1529(a). In Rounds's view, the ALJ relied too heavily on the 2006 x-rays showing normal knees, and not enough on Dr. Cavenagh's opinion that because those x-rays showed advanced osteoarthritis of

27

the hips in 2006, the hips were likely arthritic in 2003 and 2004 at some unknown level of severity. The ALJ did not fail to consider the marked arthritis of the hips revealed by the 2006 x-rays, and expressly acknowledged this salient fact. (A.R. 516.) Still, the ALJ found this evidence less relevant than the absence of complaints in the medical record of hip pain and Rounds's statement to Dr. Kirkpatrick that she retained the ability to walk a half-mile even in 2006. In considering Rounds's statements to treating and non-treating doctors, the ALJ complied with her duty under 20 C.F.R. § 404.1529(a) to consider the entire record in addition to the objective medical evidence or lack thereof. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."). Rounds's argument that the ALJ should have come to a different conclusion when weighing this evidence cannot prevail here because this court is not empowered to undertake a *de novo* review of the credibility determination, but may "merely examine whether the ALJ's determination was reasoned and supported." *See Elder*, 529 F.3d at 413. The ALJ's assessment of Rounds's testimony about her physical pain and limitations meets this benchmark.

Regarding the ALJ's rejection of her testimony about the severity of her depression, Rounds takes a similar approach, arguing that the ALJ should have resolved the inconsistencies in her favor. The ALJ characterized Rounds's testimony as describing a depression that was "so severe that she was essentially a shut in," and explained that it was not believable for the following reasons:

28

Dr. Powell's records reflected an "improvement in her symptomology, indicating that her appearance is within normal limits with generally normal mental status exam findings"; Rounds wrote on her function reports that she helps care for her grandchildren, prepares meals, does household chores, and socializes; Rounds told Dr. Yoon that her depression was kept under control by medication; and Rounds testified that she leaves the house to grocery shop and visit the corner store for snacks. (A.R. 516.) Rounds's challenge here is not to the factors that the ALJ considered, but to her resolution of the conflicting evidence. But it is the responsibility of the ALJ to consider the facts and evidence and to make independent credibility determinations, *see Elder*, 529 F.3d at 413, and because the factors the ALJ considered were "the kinds of evidence . . . that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements," *see* SSR 96-7p, 1996 WL 374186 at *3, 5 (July 2, 1996), this court does not find the ALJ's credibility determination to be patently wrong.

## C.    Residual Functional Capacity

The ALJ concluded that through her date of last insured status, Rounds retained the ability to lift and/or carry up to 10 pounds occasionally; stand and/or walk at least two hours in an eight hour workday; sit about six hours of an eight hour workday, with the ability to shift every 30 minutes; and occasionally balance, stoop, kneel, crouch, and climb ramps or stairs. (A.R. 515.) The ALJ further found that Rounds was capable of simple, unskilled work performed in a routine

environment with limited contact with employees, the public, and supervisors.  (Id.)

Rounds argues that the ALJ did not comply with the narrative discussion

requirement of SSR 96-8p and offered no evidentiary support for her conclusion that

Rounds was capable of sedentary work with an option to shift positions every 30

minutes.  *See* SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996) ("The RFC

assessment must include a narrative discussion describing how the evidence

supports each conclusion, citing specific medical facts (e.g., laboratory findings) and

nonmedical evidence (e.g., daily activities, observations).").

In the absence of any argument by the Commissioner on this issue, this court

agrees that the ALJ did not provide a narrative discussion or functional analysis to

support the RFC finding, as is required by SSR 96-8p.  But the doctrine of harmless

error is applicable to RFC analyses, s*ee Pepper,* 712 F.3d at 364, and it applies in

this case.  It was Rounds's burden to prove that she was incapable of performing

modified sedentary work prior to June 2004.  *Clifford v. Apfel*, 227 F.3d 863, 868

(7th Cir. 2000) ("The burden of proof is on the claimant through step four" of the

five-step inquiry.").  Rounds argues that the ALJ should have considered her

testimony that she could sit for only 15 to 20 minutes at a time.  She does not point

to any objective medical evidence to substantiate her testimony.  Because the ALJ

disbelieved Rounds's testimony about the severity of her musculoskeletal pain, and

because this court upholds the ALJ's credibility analysis, Rounds's testimony, alone,

is not sufficient to meet her burden of proof.   But even though the ALJ did not

credit Rounds's testimony about her inability to sit for more than 15 to 20 minutes

at a time, she accounted for Rounds's pain by providing the option to shift positions every 30 minutes. Because this court is convinced that the ALJ would reach the same result if this case were remanded, the ALJ's error in omitting the narrative analysis is harmless in this case. *See McKinzey v. Astrue,* 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). Similarly, the ALJ accounted for Rounds's depression by limiting her to simple, unskilled work, a routine environment, and limited contact with employees, the public, and supervisors, even though she disbelieved Rounds's testimony and Dr. Powell's opinion about the severity of her depression. Accordingly, as this court is convinced that no reasonable ALJ would reach a different decision on remand regarding Rounds's limitations, it upholds the ALJ's RFC analysis.

## Conclusion

For the foregoing reasons, Rounds's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

**ENTER:**



Young B. Kim
**United States Magistrate Judge**